DECISION.
{¶ 1} This is an appeal from a judgment in favor of the plaintiff-appellee, BJ Jacobs Company, on a breach-of-contract claim against the defendant, Ohio Air of Cincinnati, Inc., and the defendant-appellant, Ohio Air, Inc. ("Ohio Air"). Ohio Air raises four assignments of error, each challenging the trial court's conclusion that it was liable on a series of contracts that it maintains were solely between BJ Jacobs and Ohio Air of Cincinnati, a separate legal entity. For the following reasons, we disagree with Ohio Air that Ohio Air of Cincinnati was solely liable on the contracts and thus affirm the judgment of the trial court.
 {¶ 2} BJ Jacobs ("BJ") is a sheet-metal contractor operating in Cincinnati. Both Ohio Air of Cincinnati and Ohio Air are suppliers of materials to sheet-metal contractors. During the time in question, Christopher Brandt was the president of Ohio Air of Cincinnati, and Robert Brandt was the president of Ohio Air. The trial court found that the companies were separate legal entities. BJ never pursued a theory that the two companies were alter egos and not deserving of their separate legal status. In terms of personnel, however, Christopher Brandt was employed as a salesman for Ohio Air, and Ohio Air of Cincinnati had retained Robert Brandt as a consultant.
 {¶ 3} At trial, BJ presented evidence that it had entered into a contract, or, more precisely, a series of contracts consisting of purchase orders, with both Ohio Air of Cincinnati and Ohio Air. The orders were generated by price quotes from Ohio Air of Cincinnati, and were for materials relating to heating, ventilation, and air conditioning for a series of construction contracts. BJ's evidence showed that, prior to receiving the price quotes, it had entered into negotiations with both Robert Brandt, president of Ohio Air, and John Burns, a salesman for both Ohio Air and Ohio Air of Cincinnati. BJ was given a catalog that referred to both Ohio Air and Ohio Air of Cincinnati, but that stated conditions making all orders "subject to the approval of Ohio Air, Inc." Similarly, the catalog referred only to Ohio Air, and not to Ohio Air of Cincinnati, when stating the terms of any returns of merchandise.
 {¶ 4} BJ also presented a series of invoices to the trial court that it received for the goods. These invoices stated terms and conditions that referred to Ohio Air, Inc., exclusively, as regards to acceptance, warranty, back-charges, changes, and cancellations. Additionally, BJ presented evidence of business dealings between it and Ohio Air demonstrating, it argued, a contractual relationship between the two companies as a result of the purchase orders. These dealings involved BJ's submission of notices and drawings to Ohio Air, as well as numerous communications between the two companies on the various projects for which the materials were sought, including discussions regarding shipments, payment, and other project-related problems. BJ sent all payments to Ohio Air of Cincinnati on checks made out to the company, but BJ maintained that it did so under the belief that payment to Ohio Air of Cincinnati also constituted payment to Ohio Air. In this regard, Christopher Brandt testified that Ohio Air of Cincinnati would forward payment owing to Ohio Air through an inter-company transfer. At no time, BJ argued, was it ever notified by Ohio Air that its communications or payments were misdirected. As the company argues in its brief to this court, "Based upon the oral and written representations of Ohio Air, BJ did not distinguish between the two entities, and understood them to be one and the same. It was only after the projects went downhill, and it appeared that the entities were headed for litigation that suddenly BJ Jacobs was told they were dealing with Ohio Air of Cincinnati and not Ohio Air."
 {¶ 5} At the close of the evidence, the trial court found that the evidence was "voluminous and contradictory." However, the court found that evidence demonstrated the "dual and commonality functions of Ohio Air regarding business with Jacobs." The court stated, "The line of demarcation was shown to be blurred at best and at times non-existent in their joint dealing with Jacobs." Accordingly, the court found that the "scale tips in favor of [BJ]" on its claim that it had entered in a contract, or contracts, with both Ohio Air and Ohio Air of Cincinnati. In making its finding, the court stated that it had considered Ohio Air's evidence "attempting to show separation and distinction" between the two companies, but that it had "unequivocally conclude[d]" that both Ohio Air and Ohio Air of Cincinnati were jointly and severally liable for the breached contracts.
 {¶ 6} In its first assignment of error, Ohio Air argues that the trial court erred as a matter of law "by merging multiple contracts into one and consequently failing to consider the contracts between the parties individually and irrespective of the other contracts." BJ remonstrates, and we agree, that this is a distinction without a difference unless it is shown that the evidence failed to support the trial court's finding of a contractual relationship for any one of the specific projects. This, in turn, brings us to Ohio Air's second assignment of error, in which it claims that no evidence was presented showing that there was either an offer or an acceptance between Ohio Air and BJ for each of the projects, or that Ohio Air received any consideration relating to each of the projects.
 {¶ 7} The thrust of Ohio Air's argument on the lack of offer and acceptance between it and BJ is that each of the projects began with a price quote — a quote not by it, but by Ohio Air of Cincinnati. The quotes made no reference to Ohio Air and hence, Ohio Air argues, Ohio Air made no offer itself. Further, Ohio Air argues that it received no consideration directly for the projects because payment was made by BJ to Ohio Air of Cincinnati.
 {¶ 8} BJ responds that Ohio Air's position is overly formalistic and belies the true nature of the relationship and course of dealing between the parties. Although Ohio Air of Cincinnati submitted the price quotes, BJ maintains, it dealt with Ohio Air throughout the ordering process, beginning at the negotiating stage and continuing through procurement. Far from being a third-party supplier, BJ argues, Ohio Air was integrally involved in the ordering and supply of the goods.
 {¶ 9} Under Ohio law, contractual intent may be manifested "by written or spoken words or by other acts or by the failure to act."Nilavar v. Osborn (2000), 137 Ohio App.3d 469, 484, 738 N.E.2d 1271. Ohio recognizes three types of contracts: express, implied in fact, and implied in law. See Legros v. Tarr (1989), 44 Ohio St.3d 1, 6,540 N.E.2d 257. As opposed to express contracts, implied contracts are those that are not created or evidenced by the explicit agreement of the parties, but inferred by the law as a matter of reason and justice. Contracts implied in fact arise from the conduct of the parties, or circumstances surrounding the transaction, that make it clear that the parties have entered into a contractual relationship despite the absence of any formal agreement. "In an implied [in fact] contract no * * * formal offer and acceptance occurs and no express agreement exists. In contrast, the meeting of the minds must be established by demonstrating that the circumstances surrounding the parties' transaction make it reasonably certain the contract exists `as a matter of tacit understanding.'" Reali, Giampetro Scott v. Society National Bankv. Society National Bank (1999), 133 Ohio App.3d 844, 849-850,729 N.E.2d 1259, quoting State ex rel. Mallory v. Public Emp. RetirementBd. (1998), 82 Ohio St.3d 235, 249, 694 N.E.2d 1356.
 {¶ 10} To determine the existence of an implied in fact contract, "[t]he conduct and declarations of the party must be examined to determine the existence of an intent to be bound." Id. Because the question of the existence of an implied-in-fact contract requires crucial factual determinations regarding the intent and thought processes of the parties, deference must be paid by a reviewing court to the trial court's determinations. See, e.g., Day v. Nozik (Sept. 22, 1995), 11th Dist. No. 94-L-175. As in all civil cases, a judgment will not be overturned as against the weight of the evidence if it is supported by "some competent, credible evidence" going to all the material elements of the case. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279,280, 376 N.E.2d 578.
 {¶ 11} Initially, we note that BJ did not specifically plead a claim or claims based on a series of contracts implied in fact. However, Ohio courts have rejected the argument that there is such a significant difference between an express contract and a contract implied in fact that they must be pleaded separately for the purpose of satisfying Civ.R. 8(A). See, e.g., Truax v. Arora (Apr. 7, 1993), 9th Dist. No. 2758, and Boyas Excavating, Inc. v. Powerscreen of Ohio, Inc. (Sept. 21, 2000), 8th Dist. No. 76848. These cases hold that by using the term "contract" a complaint sufficiently states a cause of action based on either legal theory.
 {¶ 12} We interpret the trial court's findings and conclusions as tantamount to a determination of a series of implied-in-fact contracts between Ohio Air and BJ. Clearly, there was no express contract between the two companies. But we hold that there was competent, credible evidence to support the trial court's determination that Ohio Air was more than a stranger to the contract, and that it had become, in fact, a party to the contract, or series of contracts, by the tacit understanding of the parties. As noted, the trial court found that the two companies, while separate legal entities, shared a common business purpose and operated at times as one company. As the court stated, the lines of demarcation were often "blurred." The court found that both suppliers were doing business with BJ. While Ohio Air argues that there was no proof that it received any consideration since payment was relayed to Ohio Air of Cincinnati, there was a sufficient basis to conclude that the orders solicited by quotes from Ohio Air of Cincinnati were of more than incidental benefit to Ohio Air, if only in terms of name recognition, market presence, and sale of its catalogued products.
 {¶ 13} In its third assignment of error, Ohio Air challenges the trial court's finding that it entered into the contracts along with Ohio Air of Cincinnati. According to Ohio Air, the trial court erroneously relied upon its business dealings with Ohio Air of Cincinnati after the contracts had been formed to conclude that it had been involved in the formation of the contracts. Ohio Air argues that it only "participated tangentially in the relationship" between Ohio Air of Cincinnati and BJ, and that its business dealings with its sister company could not overcome the absence of the formal elements of a contract.
 {¶ 14} We consider this assignment to be essentially the same as the second. As noted, when determining the existence of a contract implied in fact, the trier of fact must take into consideration exactly the type of circumstances that Ohio Air argues are not relevant. Furthermore, despite Ohio Air's attempt to portray its involvement as strictly after the fact, there was evidence of its participation during the front end of the negotiations, as part of the bargaining process. Robert Brandt was part of the initial discussions with BJ, along with John Burns, a salesman for both companies. Both men gave Ohio Air's business card to BJ, and further indicated that Ohio Air was contemplating a Cincinnati office. BJ was also given a catalog referring to both Ohio Air and Ohio Air of Cincinnati, which made all the sale conditions subject to the approval of Ohio Air. In sum, there was substantial evidence of early involvement by Ohio Air upon which the trial court could have reasonably concluded that the two companies were acting in tandem and that it was the tacit understanding of the parties that Ohio Air was entering into the contracts along with Ohio Air of Cincinnati.
 {¶ 15} In it fourth assignment of error, Ohio Air essentially reiterates its earlier arguments, accusing the trial court of misconstruing its "subsequent" business dealings with Ohio Air of Cincinnati as evidence of contractual performance. As we have already discussed, the trial court's findings were not solely based upon Ohio Air's dealings with BJ after the fact, but on its earlier contacts with the company as well. BJ argues that the trial court's conclusions are entitled to deference, and because we find them supported by substantial evidence, we agree.
 {¶ 16} Accordingly, Ohio Air's four assignments of error are overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
SUNDERMANN, P.J., HILDEBRANDT and GORMAN, JJ.